UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:12-cv-002

| AJANAKU MURDOCK, | ) |
| --- | --- |
| Plaintiff, | ) |
| vs. | ) |
|  | ) **ORDER** |
| CHAD EADES, et al., | ) |
| Defendants. | ) |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendants J. V. Dyson and Jeremy Grey Younts, (Doc. No. 21).

**I.     BACKGROUND**

   A.     Procedural Background

Pro se Plaintiff Ajanaku Murdock is a North Carolina state court inmate currently incarcerated at Lanesboro Correctional Institution in Polkton, North Carolina, after having been convicted on September 6, 2013, of assault inflicting serious bodily injury and of attaining the status of habitual felon. On January 3, 2012, Plaintiff filed this action against Captain J. V. Dyson and Officer Jeremy G. Younts, who at all relevant times were both employed with the Statesville Police Department, and Deputy Chad Eades, who at all relevant times was employed with the Iredell County Sheriff's Office. (Doc. No. 1 at 1). Plaintiff brings suit pursuant to 42 U.S.C. § 1983, attempting to assert claims under the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution. (Id. at 6). Specifically, Plaintiff claims that, during Plaintiff's arrest on

1

February 17, 2009, Defendant Eades assaulted him and that Defendants Dyson and Younts "allowed . . . [the assault] to happen," "failed to control Deputy Eades' behavior," and/or "encouraged" Eades' actions. (Id. at 2; 6; 7). On October 24, 2012, Defendants Dyson and Younts filed a timely Answer to the Complaint denying any wrongdoing on their part and raising certain affirmative defenses. (See Doc. No. 19). On October 4, 2012, a summons was returned as unexecuted as to Defendant Eades.

On June 10, 2013, Defendants Dyson and Younts filed the pending motion for summary judgment. On June 18, 2013, this Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motion for summary judgment and of the manner in which evidence could be submitted to the Court. (Doc. No. 27). Plaintiff did not file a response to the summary judgment motion.[1]

B.  Factual Background

1.  Excessive Force: Younts

Because Plaintiff did not respond to the summary judgment motion, the only admissible evidence on summary judgment is the evidence presented by Defendants Dyson and Younts. Defendants have offered as evidence a compact disc containing video from a dashboard mounted video camera (hereinafter referred to as a "dash-cam") from the night of the alleged excessive force, as well as their own sworn affidavits. See (Doc. Nos. 23; 24; 24-1). The following evidence has been submitted by Defendants as part of their summary judgment materials:

---

[1] Because Plaintiff did not file a response to the summary judgment motion he is deemed to have abandoned his claims. See Crosby v. Gastonia, 635 F.3d 634, 637 n.3 (4th Cir. 2011). In an abundance of caution, however, the Court will address the merits of his claims. The Court does observe that, since he has presented no evidence opposing the summary judgment motion, Plaintiff fails to present any evidence rebutting the assertions made in the affidavits submitted by Defendants Dyson and Younts.

On February 17, 2009, Officer Younts was employed as a police officer for the City of Statesville. (Doc. No. 24 at ¶ 2: Younts Aff.). A few minutes after midnight, in the early morning of February 17, 2009, Officer Younts was performing patrol duties. (Id. at ¶ 3). Officer Younts' patrol car was equipped with a dash-cam, which was operating in "record mode" at all relevant times and recorded both audio and video of Plaintiff's arrest. (Id.). When the video begins, the time is 00:09:52 hours, i.e., 12:09 a.m. (Id.).

At around 12:10, the dash-cam video shows Officer Younts' patrol car traveling west on Bristol Road in Statesville approaching its intersection with Park Drive. (Id. at ¶ 6). Officer Younts asserts that he observed Plaintiff's red vehicle pass through the intersection on Park Drive, and the vehicle appeared to be speeding. (Id.). Officer Younts turned left onto Park Drive to try to catch up with the vehicle. (Id.). The vehicle then failed to stop at the stop sign at the intersection between Park Drive and Younger Avenue. (Id. at ¶ 7). Officer Younts continued driving south on Park Drive while trying to catch up to the vehicle. (Id.).

At 12:11, the vehicle turned left onto a private road leading into a trailer park on the east side of Park Drive. (Id. at ¶ 8). Officer Younts followed the car into the trailer park. (Id.). The vehicle then swung erratically from the right side to the left side of this road before abruptly stopping. (Id.). Officer Younts stopped his patrol car behind the vehicle, activated his blue lights, and radioed the dispatcher at the 911 Communications Center. (Id.). Plaintiff began driving forward again, then initiated a U-turn and began driving in the other direction, back towards the trailer park entrance. (Id. at ¶ 9). Officer Younts radioed Communications and requested a back-up police unit. (Id.). At 12:12, Plaintiff again brought his vehicle to a stop-- this time on the left side of the road facing toward the trailer park entrance. (Id. at ¶ 10). At this point, Officer Younts radioed Communications, reported the vehicle had stopped inside the

3

trailer park, and provided his precise location. (Id.). As shown on the video, the headlights on Officer Younts' patrol car illuminated portions of the inside of Plaintiff's vehicle, showing a passenger sitting in the right front seat next to Plaintiff. (Id.).

Officer Younts got out of his patrol car and shouted to Plaintiff and his passenger to put their hands up. (Id. at ¶¶ 11-12). Plaintiff and the passenger appeared to be moving around inside the vehicle. (Id.). The passenger put his hands up but then immediately brought them back down. (Id.). Officer Younts repeated the command to "get your hands up." (Id. at ¶ 13). The passenger raised his hands up but then quickly brought them down again. (Id.). Younts radioed Dispatch to inform them that Plaintiff and the passenger were refusing to obey his commands. (Id.). The video footage over the next several minutes shows Plaintiff, still seated in the driver's seat, raise his right hand up and then bring it back down out of Officer Younts' view. (Id. at ¶ 14).

At 12:14, another Statesville police officer, W. H. Goforth, pulled into the trailer park. (Id.). Around that same time, Plaintiff turned around in his seat and reached backward. (Id.). At 12:15, Officer Goforth's vehicle can be seen passing down the right side of Officer Younts' patrol car. (Id. at ¶ 15). Goforth made a U-turn and parked his police car to Younts' right facing in the same direction (i.e., towards the trailer park entrance/exit). (Id.). Officer Younts next radioed Dispatch and reported that the passenger appeared to be lying down inside the car or bending down out of Younts' view. (Id. at ¶ 16). Officer Younts repeated his commands to Plaintiff to "get his hands up," but Plaintiff did not comply and, instead, remained in the car and smoked a cigarette. (Id. at ¶¶ 16-17). At 12:17, Statesville police officer Jason Harris pulled into the trailer park and stopped his patrol vehicle near the right front corner of Plaintiff's car. (Id. at ¶ 18). Officer Harris exited his patrol car and remained standing beside his open driver's

4

side door.  (Id.).

In the next minute on the video, Officer Younts can be heard ordering Plaintiff to use his left hand to open the driver's side door of his car and to step out of the vehicle.  (Id. at ¶ 19).  From approximately 12:18 to 12:19, Officer Younts repeatedly instructed Plaintiff to get out of his car, and Plaintiff repeatedly ignored those commands.  (Id.).  At 12:19, Plaintiff stuck a cigarette out of the open door of his car and tapped on it to dispose of its ashes.  (Id. at ¶ 20).  Furthermore, during this time, someone can be heard yelling profanities at Younts such as: "Hold the f*** up" and "Go the f*** on" in response to Younts' commands that Plaintiff exit his vehicle.  (Id. at ¶ 21).  In Younts' opinion, Plaintiff was the person yelling.  (Id.).

At 12:19, Defendant Chad Eades—a deputy then employed by the Iredell County Sheriff's Office—arrived and parked his patrol car behind Officer Harris' vehicle with the front of Deputy Eades' car angled towards Plaintiff's car.  (Id. at ¶ 22).  During the next minute of video, Officer Younts can be heard again commanding Plaintiff to put up his hands and get out of his vehicle.  (Id.).  Plaintiff continued to ignore Younts' commands until approximately 12:20, when Plaintiff finally stepped out of his car and stood next to it, where he continued smoking his cigarette.  (Id. at ¶ 23).  When Plaintiff finally emerged from his car, approximately nine minutes had passed since Younts first activated his blue lights; approximately eight minutes had passed since Younts began commanding Plaintiff and his passenger to "put up their hands"; and approximately three minutes had passed since Younts first commanded Plaintiff to get out of his vehicle.  (Id.).

At 12:20, Officer Harris walked around the back of Plaintiff's car and assisted Officer Younts with bringing Plaintiff to the ground and applying handcuffs.  (Id. at ¶ 24).  Officer Goforth and Deputy Eades remained on the passenger side of Plaintiff's car and placed the

passenger under arrest. (Id.). For the next minute on the video, officers Harris and Younts then struggled to handcuff Plaintiff while he lay on the ground to the left of his car with his back facing his car. (Id. at ¶ 25). At 12:21, the officers completed the handcuffing process, and at least one of them searched Plaintiff's pockets. (Id.).

At approximately 12:22, the right side of Plaintiff's body is still visible on the video. (Id. at ¶ 26). The video shows Officer Harris kneeling next to Plaintiff's right side with the left side of Harris' body facing the dash-cam on Younts' patrol car. (Id.). At this time, Officer Younts was located on the left side of Plaintiff's body and out of the dash-cam's view. Intermittently, however, the video captures portions of Younts' body leaning over Plaintiff while searching him. (Id.).

At around 12:23, Officer Younts left Plaintiff in Officer Harris' custody and walked back toward his patrol car, stopping approximately eight to ten feet away from Plaintiff. (Id. at ¶ 27). Younts states that he did so to be able to communicate with Communications without being interrupted. (Id.). At approximately 12:23, Officer Younts can be heard speaking to Communications over the walkie-talkie microphone attached to his lapel. (Id.). At this point, Younts was still approximately eight to ten feet away from Plaintiff, who remained on the ground with Officer Harris kneeling next to him. (Id.).

While Officer Younts was speaking to Communications over his radio, the dash-cam shows Deputy Eades move from the passenger side to the driver's side of Plaintiff's vehicle. (Id. at ¶ 28). Plaintiff and Eades then engaged in a verbal altercation. (Id.). The video then shows Eades kicking Plaintiff in the head one time. (Id.). At that moment, Officer Younts was still approximately 8 to 10 feet away. (Id.). Younts immediately said to Defendant Eades, "Chad, Chad, Chad." (Id.). Officer Younts states in his affidavit that Deputy Eades' conduct was

6

sudden and unexpected. (Id. at ¶ 29). Officer Younts further asserts that because he was eight to ten feet away from Plaintiff and Eades and because Younts was focused on his radio call to Communications, there was nothing that Younts could have done to prevent Eades' actions. (Id.). Officer Younts states that when he said "Chad, Chad, Chad" he was trying to defuse the situation and calm down Eades.

At around 12:24, Officer Younts' supervisor Sergeant Sharpe arrived. (Id. at ¶ 30). The Sergeant approached and spoke with Plaintiff. (Id.). Younts then walked back to Plaintiff. Officers Younts and Harris then completed their search of Plaintiff. (Id.). At 12:25, Deputy Eades' supervisor—Lieutenant Jenkins from the Iredell County Sheriff's Office—parked his car opposite the left front side of Plaintiff's vehicle. (Id. at ¶ 31). Officers Harris and Younts then escorted Plaintiff to the right rear side of Younts' patrol car. (Id.). In the video, Younts is located to Plaintiff's left and Harris to Plaintiff's right. (Id.). During this time, Plaintiff asked Officers Harris and Younts to give him Deputy Eades' name. (Id. at ¶ 32). Officer Younts told Plaintiff the officer's name was Eades and Sergeant Sharpe can then be heard repeating this information on the video. (Id.). From around 12:25 through 12:26, both Sergeant Sharpe and Officer Younts can be heard instructing Plaintiff several times to sit down in the rear seat of Younts' patrol car. (Id. at ¶ 33). Plaintiff, however, ignored their commands and can be heard yelling at Defendant Eades such things as "I'm fixin' to get out of jail (inaudible)" and "I'm a f*** you up. You know that right?" and "I'm gonna get your a**. I swear to God." (Id.). Plaintiff can then be heard resisting and scuffling with Officers Younts and Harris as they try to put him in the back of Younts' patrol car through the rear passenger's side door. (Id. at ¶ 34). Officer Younts states in his affidavit that Plaintiff was resisting so actively that Harris had to open the rear driver's side door and pull Plaintiff in from that side of the car. (Id.). The officers

7

finally succeeded in getting Plaintiff into the back seat. (Id.).

Officer Younts asserts that at that time he intended to finish collecting the information that he needed and to transport Plaintiff to the police department for further processing. (Id. at ¶ 35). Before Younts could do so, Plaintiff began banging forcefully on one of the windows of Younts' patrol car. (Id. at ¶ 36). At around 12:27, Plaintiff can be heard thumping loudly on the car. (Id.). Younts and the other Statesville Officers can be heard yelling to Plaintiff to stop banging on the glass and warning him not to break the car's window. (Id.). One of the officers can then be heard stating, "He's going back behind him," which referred to Plaintiff working his handcuffed wrists from behind his back, down past his legs and feet so that he could bring his cuffed hands up in front of him. (Id.). Officer Younts states in his affidavit that because Plaintiff, who now had his handcuffed wrists and hands in front of his body, posed a danger to any officer operating the vehicle, it became necessary to order Plaintiff back out of Younts' patrol car so the officers could reposition the handcuffs behind Plaintiff's back. (Id. at ¶ 37).

Plaintiff, who was now standing outside the rear of Younts' patrol car, can be heard yelling at Defendant Eades—"I'll beat your mother f***ing a**, Eades." (Id. at ¶ 38). Officer Younts can then be heard attempting to intervene. (Id.). Officer Younts told Plaintiff to pay attention to him and not to Eades and to calm down and "chill out." (Id.). Younts can be heard calmly explaining to Plaintiff that the officers were going to take the handcuffs off and handcuff him behind his back a second time. (Id.). Plaintiff can be heard responding to Officer Younts, "That's fine, you ain't done s*** to me." (Id.).

At 12:28, Plaintiff can be heard saying to Defendant Eades, "If they take me out of these handcuffs, I am going to f*** you up. I swear to God." (Id. at ¶ 39). Plaintiff can then be heard asking Officers Younts and Harris for their names, and both officers told Plaintiff their names.

8

(Id.). Officer Younts can also be heard telling Plaintiff that everything was going to be alright if he would just calm down and "chill out." (Id.). In the seconds that follow, Plaintiff and Defendant Eades can be heard engaging in a further verbal exchange as Officers Harris and Younts completed handcuffing Plaintiff for the second time at around 12:29. (Id. at ¶ 40). Plaintiff and Eades can be heard continuing with their verbal exchange while Officer Younts attempted to put Plaintiff back into the rear seat of the patrol car. (Id. at ¶ 41). On the video tape, Younts can be heard saying to Plaintiff, "Murdock, get in the car, come on. It's okay. Turn around." (Id.).

Younts states that at that point his attention was focused on getting Plaintiff to turn around and lower his head so that Younts could put him back into the patrol car. (Id. at ¶ 42). At 12:29:25, the video clearly records a spitting sound. (Id.). Officer Younts states that this was the sound of Plaintiff spitting in Defendant Eades' face. (Id.). Officer Younts states that Defendant Eades then hit Plaintiff once in the face. (Id.). Neither the spit nor the punch is shown on the video, as the camera was at all times facing in front of the patrol car. Younts states that this exchange (i.e., the spitting and the punch) took place spontaneously without any warning to Officer Younts. (Id. at ¶ 47). Younts states that he was focused on attempting to secure Plaintiff in the patrol car and that he could have done nothing to prevent Eades from hitting Plaintiff. (Id.).

Sergeant Sharpe and Officer Younts can next be heard telling Plaintiff to calm down ("chill out") and get back into the car. (Id. at ¶ 43). An officer can then be heard asking Eades, "Did he spit on you," to which Plaintiff responded, "Yeah, I did it! Yeah, I did it! Yeah, I did it! Yeah, I did it!" (Id.). Officer Younts states that while the officers were attempting to get Plaintiff back into the rear of Younts' patrol car for the second time, he again resisted. (Id. at ¶

9

44). Plaintiff can then be heard spitting a second time, and Officer Younts asserts that this was directed towards Defendant Eades. (Id.). This struggle with Plaintiff lasted until around 12:32, when Plaintiff finally allowed the Officers to place him in the back seat. (Id.).

Officer Younts asserts that he never used excessive force against Plaintiff, and that he never encouraged or condoned Deputy Eades to use excessive force against Plaintiff. (Id. at ¶ 45). Officer Younts states that he never laughed at Deputy Eades' behavior as Plaintiff alleges in his Complaint. (Id.). Indeed, the video does not show Younts laughing at Eades' behavior. To the contrary, and as noted, the video recorded the audio of Younts calmly saying to Eades, "Chad, Chad, Chad" after Eades kicked Plaintiff's head.

### 2. Excessive Force: Dyson

On February 17, 2009, Defendant J. V. Dyson was also employed as a police officer with the City of Statesville, and he held the rank of Police Captain. (Doc. No. 23 at ¶ 2: Dyson Aff.). Dyson asserts in his affidavit that he was off duty and at his home asleep when the alleged excessive force occurred. (Id. at ¶¶ 3-4). According to Dyson, he was awakened by a telephone call from Sergeant Sharpe, the acting patrol supervisor that night and Dyson's immediate subordinate. (Id. at ¶¶ 4-5). During this phone conversation, the Sergeant advised Dyson that Officer Younts had arrested Plaintiff. (Id. at ¶ 6). Sharpe advised Captain Dyson that Plaintiff was accusing Defendant Eades of using excessive force against Plaintiff. (Id. at ¶ 7). Because Eades was not a member of the Statesville Police Department, Captain Dyson had no authority over Eades. (Id. at ¶ 8). Dyson did, however, tell Sergeant Sharpe that he would come to the police department and that he wanted to speak with Officer Younts when he arrived. (Id.).

When he arrived at the police department, Captain Dyson obtained a copy of the video from the dash-cam in Officer Younts' patrol car. (Id. at ¶ 9). After reviewing the video, Dyson

10

spoke with Younts, who told him that during Plaintiff's arrest, he (Younts) had witnessed Eades strike Plaintiff with his foot one time while Plaintiff was handcuffed and lying on the ground. (Id. at ¶ 10). Officer Younts also told Dyson that, after being placed in Younts' patrol car, Plaintiff moved his cuffed hands from behind his back, down past his feet and brought them in front of him. (Id.). Younts told Dyson that, for officer safety reasons, he removed Plaintiff from the rear of his patrol car to complete the handcuffing process a second time so that the handcuffs would be positioned behind Plaintiff's back. (Id.).

Officer Younts informed Captain Dyson that, while he was in the process of securing Plaintiff's handcuffs on this second occasion, Plaintiff became involved in an angry verbal altercation with Eades; that Plaintiff spit in Eades' face; and that Eades reacted by punching Plaintiff one time. (Id. at ¶ 11). Younts also told Captain Dyson that when Eades struck Plaintiff with his foot during the first incident and with his fist during the second incident, both events were sudden and unexpected and that Officer Younts was unable to prevent Eades' actions. (Id.).

After speaking with Younts, Captain Dyson asked Plaintiff about the incident. (Id. at ¶ 12). Plaintiff told Dyson what happened, and his version was consistent with Officer Younts' statements. (Id.). Later that day, Dyson showed the Chief and Assistant Chief of the Statesville Police Department the dash-cam video footage. (Id. at ¶ 13). After discussing the incident, they notified the Iredell County Sheriff's Office of Eades' actions during Plaintiff's arrest. (Id.). Captain Dyson delivered a copy of the dash-cam video to Sheriff's Office Captain Darron Campbell, who was conducting a criminal investigation into the incident on behalf of the Sheriff's Office. (Id.). Dyson also provided a copy of the video to an Internal Affairs Investigator, who was conducting an administrative investigation on behalf of the Sheriff. (Id.).

11

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

The Court first notes that in his Complaint, Plaintiff purports to bring a "Fifth Amendment" claim. The Fifth Amendment protects against compulsory self-incrimination. See U.S. CONST. amend. V. Here, Plaintiff does not allege that he was interrogated by Defendants or that he was compelled to incriminate himself. Thus, to the extent that Plaintiff is attempting to bring a Fifth Amendment claim, this claim fails as a matter of law.

Next, as to his Eighth Amendment and Fourteenth Amendment claims against Dyson and Younts, Plaintiff does not allege that Dyson or Younts personally used excessive force against him. Instead, Plaintiff claims that Dyson and Younts are liable because they failed to prevent or stop the excessive force allegedly used by Eades.[2] Law enforcement officials may be held liable in Section 1983 actions in which the officials "fail[] or refuse[] to intervene when a constitutional violation such as an unprovoked beating takes place in [their] presence." Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998); see also Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994). To succeed on a theory of what is sometimes called "bystander liability," a plaintiff must show that the defendant police officer: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. Randall v. Prince George's Cnty., 302 F.3d 188, 204 (4th Cir. 2002). Applying this three-part test to the facts in this action, the Court finds that Captain Dyson and Officer Younts are entitled to summary judgment.

---

[2] When Deputy Eades allegedly used excessive force, Plaintiff was already handcuffed, under arrest, and in the custody of Officers Younts and Harris on charges that included drunk driving and speeding. As such, his status was that of an arrestee or pre-trial detainee. "[E]xcessive force claims of a pretrial detainee are governed by the Due Process Clause of the Fourteenth Amendment." Young v. Prince George's Cnty., Md., 355 F.3d 751, 758 (4th Cir. 2004) (quoting Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998)). To succeed on such a claim, a plaintiff must show that defendants "inflicted unnecessary and wanton pain and suffering." Id.

First, Defendant Dyson has presented evidence at summary judgment that he was not even present at the time of Plaintiff's arrest but he was, rather, home in bed asleep. (Doc. No. 23 at ¶ 14: Dyson Aff.). As such, he did not know of the actions taken by Deputy Eades during Plaintiff's arrest. Thus, Defendant Dyson had no opportunity to prevent Eades' conduct. Moreover, once informed of the situation, Dyson drove to the police department, where he interviewed both Officer Younts and Plaintiff; reviewed the contents of the dash-cam video; informed his superiors; and provided the information he had collected to the Iredell County Sheriff's Office where Deputy Eades worked. (Id.). Since Plaintiff did not respond to the summary judgment motion, he has failed to present any admissible evidence on summary judgment to rebut this evidence. Thus, Defendant Dyson is entitled to summary judgment in his favor.

Next, as to Plaintiff's claim against Officer Younts, the dash-cam video shows that when Defendant Eades kicked Plaintiff, Officer Younts was standing about 8 to 10 feet away, and Younts was focused on his radio communications with the dispatcher. (Doc. No. 24 at ¶ 46). The dash-cam video clearly shows that Eades' physical contact with Plaintiff was spontaneous, without warning, and over in an instant. As such, and as established in his affidavit testimony, the evidence on summary judgment shows that Officer Younts was not expecting this altercation to take place and was too far away to intervene and stop this incident from happening. (Id. at ¶ 46).

Next, as to the second altercation between Plaintiff and Eades, Younts asserts in his affidavit that Deputy Eades hit Plaintiff because Plaintiff had spit in Eades' face. (Id. at ¶ 47). Officer Younts further asserts that when this happened he was focused on Plaintiff and trying to get him safely and securely back into the rear of the patrol car. (Id.). Younts states that he did

14

not have any reason to suspect that Plaintiff would spit in Eades' face or that Eades would react by punching Plaintiff. (Id.). Younts states that both actions took place spontaneously and without warning, and there was nothing that Officer Younts could have done to prevent them from happening. (Id.).

As the recorded audio from the dash-cam reflects, Officer Younts was doing his best to verbally calm Plaintiff and get him safely handcuffed and seat-belted in the back of the patrol car. (Id. at ¶ 48). As recorded during this segment of the video, Officer Younts provided Plaintiff with Defendant Eades' name as well as his own. (Id.). Furthermore, after returning to the police department following Plaintiff's arrest, Officer Younts made his dash-cam video available to Captain Dyson and gave a verbal statement to the Captain concerning what had transpired between Plaintiff and Eades. (Id. at ¶ 49).

Here, the admissible evidence—which Plaintiff had not even attempted to rebut—shows that Officer Younts had no advance notice that the two altercations between Plaintiff and Eades were about to take place; he was not physically positioned in a manner that would have provided him with a reasonable opportunity to prevent Eades' actions; and Officer Younts did not make a knowing choice or decision not to act to stop Eades. As such, Plaintiff's bystander liability claim against Officer Younts fails. In sum, for the reasons stated herein, Defendants Dyson and Younts are entitled to summary judgment in their favor.

Finally, the only remaining Defendant is Chad Eades. As the Court has noted previously, a summons for Defendant Eades was returned unexecuted on October 4, 2012. Defendant Eades has not made an appearance in this action, and it does not appear that he was ever served. After the summons was returned as unexecuted, Plaintiff did not make a second attempt to have Eades

15

served.[3] Thus, it appears that Plaintiff's claim against Defendant Eades is subject to dismissal sua sponte based on failure to prosecute. See FED. R. CIV. P. 41(b) (failure to prosecute); FED. R. CIV. P. 4(m) (dismissal for failure to serve). The Court further notes that the North Carolina Department of Public Safety website indicates that Plaintiff has been incarcerated within the state prison system since September 9, 2013, at the latest, with his current address at Lanesboro Correctional Institution in Polkton, North Carolina. However, the Court's docket is showing a private residence in Mooresville, North Carolina as Plaintiff's current address. A pro se plaintiff must keep the Court apprised of his current address, and the failure to do so constitutes a failure to prosecute. See Carey v. King, 856 F.2d 1439, 1440-41 (9th Cir. 1988). Before dismissing the remaining claims against the sole remaining Defendant Eades for failure to prosecute, the Court will give Plaintiff notice and opportunity to explain why his claims against Defendant Eades should not be dismissed.

IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 21), is **GRANTED**, and Defendants Dyson and Younts are dismissed from this action.

2. Plaintiff shall, within fourteen days of service of this Order, submit an explanation to this Court as to why he has failed to effectuate service on Defendant Eades, particularly during the time period when Plaintiff was not yet incarcerated. Plaintiff's failure to comply with this Order will result in the dismissal of Plaintiff's action

---

[3] Although Plaintiff is now incarcerated, there is no indication that he was incarcerated when the summons was returned as unexecuted as to Defendant Eades, and it does not appear that he was incarcerated until well after that date. Thus, incarceration does not appear to have hampered Plaintiff's obligation to attempt to locate a current address for Defendant Eades so that service on Eades could be re-attempted. As such, stating that he could not find Eades' address because he is currently incarcerated will not suffice.

against Defendant Eades without further notice.

3. The Clerk shall change the address on this Court's docket for Plaintiff to Lanesboro Correctional Institution, P.O. Box 280, Polkton, North Carolina 28135, and the Clerk shall mail this Order to Plaintiff at that address.

Signed: March 18, 2014

Robert J. Conrad, Jr.
United States District Judge